Fresenius Kabi, 2019, 1329, and 1367. Mr. Unikowski. Thank you, Your Honors. May it please the Court. The District Court erred in holding that Fresenius Kabi had proven, by clear and convincing evidence, that the about 2% decrease limitation was inherent in the allegedly obvious combination. The District Court examined data taken from... Counsel, Counsel, Claim 6 is obviously not dependent from Claim 1. Claim 1 claims a compound that's in the prior art, dexmedetomidine, in a sealed glass container, wherein, wherein, the composition, when stored for at least five months, degrades no more than 2%. There is nothing in that claim to inhibit decomposition. Therefore, it is obviously inherent in the compound, which is, you look at the structure, it's a very simple compound. And when we get to Claim 6, dividing it by a factor of 25 is hardly invented. So why wasn't it clear that the District Court was correct? So, I mean, the precise question that the District Court resolved was whether or not this particular numerical stability property was inherent in this very low concentration. So, the prior art involved the 100 microgram per milliliter Presidex concentrate, and there was evidence in the record, which we're not disputing, that that was stable at the relevant period. But this was a much more, it was a much lower concentration version of Presidex. And, in fact, there's testimony at trial that's the lowest concentration anyone had ever worked with. And so there's a question of whether or not that would meet the stability property. At five months, you know, I mean, 4 micrograms per milliliter was a very low concentration. Two percent of that is obviously even lower. And so the question was, how can you show at five months that would have inherently achieved that property? There was no evidence in the prior art, no actual data in the prior art, showing it would meet that property. And so to prove its obviousness case, Fresenius-Cabey relied on the doctrine of inherency. And we don't think that on the record before the court, first of all, we think there's a legal error and a factual error. We think that the District Court didn't conduct the correct legal analysis to find inherency, which was the premise of Fresenius-Cabey's case. And we think that it… Well, it seems to me your problem is you have testimony from the Fresenius expert witness that it's inherent, that it will always meet the degradation standard if you stored it in a glass bottle with a rubber stopper. And the District Court credited that testimony. And so you've got a problem. You say, well, the District Court didn't consider, you know, filters or particular brands of filters or impurities. But in fact, you never raised those issues at the District Court level. So I don't see there's any reason for the District Court to address those particular features. So you have testimony that says it's inherent. The District Court believed it. So why isn't that the end of it under a clear error standard? Well, so we think there's a legal and a factual component to arguments. So let me start with the law. So I think what the District Court ultimately did was it examined the data from the non-prior art embodiments, either made by the inventor or with the teachings of the inventor's own work. And based on its examination of that data, it drew the conclusion that this property was inherent in the allegedly obvious combination. So to be clear, you're talking about 21 batches, the 18 and then the 3. That's right. And from that, the District Court, since there were 21 batches and there was testimony about them, that all 21 met the 2% limitation, the District Court, from that, included that inherency had been proven. Is that correct? That's what the District Court held, yes. So then why, I don't understand how we could possibly find clear error in that. This is not a small batch problem. This is not one batch. This is 21 batches. And I understand that a different District Court, based on the exact same data, reached a different conclusion, but there's no collateral estoppel here. It's different defendants are entitled to make this challenge. And so maybe it wasn't clearly erroneous in the other case, and it's not clearly erroneous here, even though there are different standards. So the problem is not the number of batches. I agree there's lots of batches. But the problem is not the number of batches, it's which batches. Because all of these batches were non-prior art, and they may have been made under particular conditions that may or may not have existed in the allegedly obvious combination. Look, I think it's useful to note. Did you make that argument below? I think, well, here's what we made. I don't want to give the misimpression. No, did you make that argument below? You didn't. So if you have a reason now why you think these batches were deficient and shouldn't have been good enough for the district court to reach its conclusion, it was inherent on your burden for you to have raised that to the district court. It's like the points Judge Steich raised. You're making a lot of arguments now why the district court should have rejected those 21 batches. But the district court either didn't have those arguments in front of it at all, or if it did, it found against you. And you know what? That's just weighing of the evidence. We don't redo that. I don't want to give a misimpression of what arguments we raised and what we didn't raise below. So here's what I think we did raise below. I think that we clearly said that the inventor's own work wasn't enough to prove inherency. That's an argument that I think everyone agrees we made. And then in the opening statement, which I know is not evidence, but in the opening statement I think we laid down the gauntlet and we said, look, if they're going to prove inherency, they're just going to rely on the inventor's own work. That's not enough, because there could be many differences between the inventor's own work and the allegedly obvious combination. And they decided strategically not to argue that the specific manufacturing conditions that are disclosed in the patent are obvious. They could have done that. They could have said all these measures that are in the patent were obvious, but they elected to construct this generic allegedly obvious combination without those features. And so we had very general testimony. I'm not saying we proved or even tried to prove that nitrogen specifically affected the outcome and all those other things. We just had general testimony in the record that there's these specific manufacturing conditions under which the inventor's own work was made and that that may have affected stability. That's the record that we showed. And I think it was incumbent on Fresenius Cabe, which after all bears the burden of proof, to prove this link, this extrapolation between the inventor's own work. But we had testimony that it was always the case that it would always be stored in a glass bottle with a rubber stopper, that it would always meet the degradation limitation. And the district court believed that testimony. So I think just two things about the testimony. First of all, the district court discusses this testimony that's rock stable in the portion of its opinion addressing reasonable expectation of success. We're not just criticizing how the district court wrote its opinion. I think it's more substantive than that because the district court's analysis, if I could just direct the court to where the court talks about it, it's at page 44. So the district court talks about the testimony. It says, quote, The court therefore adopts Dr. Kipp's testimony that oxidation affects dexmedetomidine only under very stringent conditions and then, and this is I think the key language, a POSA would not have expected a lot of chemical change to occur in room temperature storage conditions for five months. And then the district court quotes case law saying that the expectation of success, excuse me, need only be reasonable, not absolute. So it's clearly evaluating this evidence under the very different standard of reasonable expectation of success versus clear and convincing evidence that a property necessarily exists. And I think that if the district court... First step, just as a matter of process, can I ask you just to slow down a little because you talk really, really fast. I'm sorry. That's okay. But the other problem you have is, so look, I actually agree with you. It's unfortunate that after reaching the conclusion at the bottom of page 40 wherein the court made an express fact-finding regarding inherency, it then morphed into some sort of reasonable expectation of success combined with inherency. Now, of course, reasonable expectation of success is a factor in obviousness. I get that, but it has no place in inherency analysis. The problem I have... And so I think to the extent you're complaining that it seems like the district court messed up the test from page 41 on, I actually agree with you. But on page 40, she made a fact-finding based on the data and the testimony of Mr. Kipp, which is discussed on page 35. And that's the problem for you. I don't see that there's clear error in that fact-finding on inherency. When she morphed into this reasonableness, reasonable expectation of success based on chemical properties, I'm not sure I actually understand that portion of her opinion. But she had already made a very clear fact-finding based on the batches and the testimony in advance of that. Well, two things about that. First of all, I think that the fact-finding was based... I mean, I've gone through that inherency portion of her opinion many, many times. And as far as I can tell, it's based on the non-prior art data. This issue of the compound being rock-stable, that is testimony that's in the record. But that is testimony that was discussed later. And I don't think that just the qualitative statement of something being rock-stable is enough to show an inherent property of something. So to the extent the district court did rely on this rock-stable... Yes? But no, that's not alone. There were 21 separate batches. Every single batch met the test. So you have that in combination with the testimony. It's not like some batches met it and some didn't and there was a question. Yes, but I think that what has to be shown is that those batches... It could be a thousand batches. The step that's crucial is to show that they're relevantly similar to the allegedly obvious combination, okay? And the record is clear on the face of the patent that all these batches were made under these particular conditions. So I'm not saying we put on a case about those conditions and exactly how they affected the outcome. All we're saying is that it was incumbent on Fresenius Cabe to present a case that, because these batches were not prior art... Did you respond to a case that you didn't make at all in the district court? You didn't... I've read your response brief. You didn't raise these manufacturing differences in connection with inherency. And to the extent that the district court went on and discussed reasonable expectation of success, that's because you argued it separately. I think this was a considerable portion of our case at the trial. I think that when the trial started, we made clear to the court that it wasn't enough just to show that from the inventor's own work that you can get to the generic, allegedly obvious combination, because the inventor's own work may well have been made on particular conditions. You've got to draw that link as part of their affirmative case. And then there's certainly testimony in the record that the inventor's own work was made under particular conditions. I mean, that's the case that we presented. And so I think it's now incumbent to show either that those conditions were obvious, which I think they made the strategic decision not to show, or that you can draw the link that even when those conditions aren't there, you can achieve the same outcome. And I think that the reason that... It's a somewhat unorthodox inherency case, and I'll say one more point, and I'll sit down. It's a somewhat unorthodox inherency case for Senya's caveat raised, because they're trying to prove this very particular numerical property of prior art based on embodiments that don't come from the prior... Yes? They're trying to prove a property that is apparently inherent in the compound because there's nothing in the claim otherwise that produces that property. It has to be inherent. I don't think it has to be inherent. I mean, so just... It's interesting to note that the prior art version of the compound, Presidex Concentrate, at 100 micrograms per milliliter, Dr. Kipp, which was Fresenius Cavy's expert, attempted to construct a model based on that. And this is all discussed in the district court's opinion. We cross-examined Dr. Kipp and it made clear that at least one version of the kinetics model he said was possible would spit out a result in which the property wasn't inherent. So in response, Dr. Kipp argued, and the district court credited this testimony, that you shouldn't look to the data... If it's not inherent, what is there in the claim to bring about that stability? And if there's nothing... If it's not inherent and there's nothing in the claim to bring it about, the claim is inoperative. I don't think that's true, Your Honor, because, I mean, the specification describes these various steps that exist. So I think it's enabled in that the specification describes steps that were taken in order to achieve what we're claiming as the result, which is the stable... But you're not in the claim. It's not in the claim, I know, but I think enablement is determined based on the specification. And so I think that we've given the steps necessary to produce... So I think that we had developed it. We had it. We developed this product. So I think we're entitled to try to patent it. And the specification describes all the steps that we needed to take in order to get to where we wanted to go. You'd like to say some revising? Yes, I would, Your Honor. Thank you for that. We will save it for you. Mr. Alley? May it please the Court. Tacking on a property to an obvious invention does not make it patentable. This case is about taking the prior commercial product, the drug in water in a glass bottle, and adding more water. Nothing else was added to help stability. Nothing was changed. That's the invention, and that's what the District Court found. Well, is it possible that something at a different dilution degrades differently? In theory, it is possible. The District Court here, though, found that for dexmedetomidine, in view of all the data at different concentrations, concentration did not make a difference to stability. And that was supported by expert testimony that further added there's no reason to think that concentration would change for this particular drug, given its properties. So, as to the 2% decrease property, therefore, Hospiro now argues something that it didn't argue before. It has these factors listed, A through F, in its briefing that it speculates may have had a change in the outcome, but that's if they had argued it and if they had evidence to that effect. And in this case, what we have shown both through the briefing and the District Court's findings is the 2% analysis was supported completely by all of the data universally and the expert testimony, and these A through F factors, actually, if we looked at the evidence now, which we do not suggest we should, but even if that happened, still only supports Fresenius-Cabe. It does not support any question that there could be a stability issue even after taking into account all of the new arguments as A through F. Do you agree with the question the way I framed it to your opponent, which is by the bottom of page 40, the District Court had made its finding of inherency based on the testimony that it cited and the batches, and that everything thereafter, even if I find a problem with it, it's harmless error because this is a fact-finding that is supported in the record and is not clearly erroneous based on what she cited? Yes, Your Honor. And I believe what the District Court was doing to help with that is addressing the arguments Hespera did present because in the post-trial briefing under a reasonable expectation of success section... Yeah, but she seemed to sort of weave the reasonable expectation of success in with the inherency discussion in a way that made me uncomfortable in pages 42 and 43 because we all know it's not a reasonable expectation, it's certainty. It's not a possibility of, it's always when it comes to inheritance. That's right, Your Honor. And so that made me uncomfortable that she was morphing together two legal concepts that had no business being morphed. Well, candidly, it seems the District Judge, Chief Judge Palmer, was also confused because that section starts with it's not clear whether inherency requires consideration of reasonable expectation of success as a threshold issue. Morphing those two in the same sentence. But that confusion was expressly discussed and reasonable expectation of success in any event, Your Honor's question, was treated completely separately. So the inherency question was completed including both the test data and the evidence that the expert, Dr. Kipp, had offered at trial. I would just add some additional points based on what counsel had argued. One is that there was no strategic decision to present some issues and not others. The issue was presenting the case, which was the data and the expert testimony and responding to any arguments that Hospira made through the trial and through its post-trial briefing. Of note, they did have a formulation expert that they could have asked any of these questions to, but they only asked one topic, one subject matter arose in that testimony about this Rock Stable issue and that was theoretical and nothing else. No questioning of the data. In fact, the data was further augmented and supported by another of Hospira's own witnesses, Dr. Ogenstad, who did a statistical analysis and the judge found below that all of that also helped Fresenius Cabe in support of the data that was presented here. I would finally add that if it's not in the claim, these variables that are not in the claim do present some issues because that is making what's a product claim into potentially a process claim or product by process claim and if Hospira wanted to add other variables or do other things to improve stability, they could have and should have done that. Here, they did not and instead, what they're trying to do on appeal is read example five and find variables that are in example five of the patent specification even though that was not even the example that supported the stability claim at issue here. Claim six is supported by example six. There was one experiment that was done. That one experiment resulted in the 2.3% of loss of dexmedetomidine at five months and that, we all agree, was the outer boundary. Hospira calls that the outer boundary. Doing nothing at all and that's what the evidence showed that there's nothing that was specifically done for example six. Nothing is said about that. Still only gets to the 2.3% with the district court made another finding factually that that was about 2% and in fact, credited Hospira's inventor testimony that 2.3% is within 2% in the context of the patent. Even before reaching this about the added additional room and breath to the scope of the claim. There was no clear error that Hospira has identified and for all of those reasons the decision should be affirmed. Thank you counsel. Mr. Unikowski has a little more than two minutes. Thank you your honor. I'd just like to address the question from Judge Moore about the potential harmlessness of what we view as the error in the district court's discussion of reasonable expectation of success. I don't think that that could be regarded as harmless error because as counsel described, a very important portion of the inherency case by Fresenius Cabe was not just the data from the non-prior art but this argument that this was rock stable and therefore we would expect to see it in any embodiment and not just the non-prior art embodiments that were studied. The problem is first of all of course as we explained in our brief that kind of qualitative statement is not enough to achieve this particular quantitative threshold of about 2% decrease at five months and to the extent the district court analyzed that under the wrong standard the reasonable expectation of success standard I don't think the court can just sort of separate that from the portion of the opinion addressing inherency. So if the district court understood that rock stable analysis to satisfy a burden under a lower standard then I think that the inherency analysis is flawed and if you take that out and you're just relying on the non-prior art embodiments that may or may not have been the same as the generic allegedly obvious combination I don't think that's enough evidence to show inherency or at the very least I think the district court should have another chance to make that extrapolation that we believe is necessary. If there's no further questions from the court. Thank you counsel. The case is submitted.